**CLIFTON PRODUCTS, INC.**

v.

The **UNITED STATES.**

No. 359–57.

United States Court of Claims.

Oct. 17, 1969.

H. Blackmer Johnson, New York City, attorney of record, for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on June 12, 1969. On August 25, 1969, the parties filed a joint motion stating that they did not intend to except to the commissioner's report and moved its adoption by the court. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants the motion of the parties and adopts the report as the basis for its judgment in this case without oral argument. Therefore, it is concluded that plaintiff is entitled to recover $44,567.44 on its claim and that defendant is entitled to recover $16,726.-67 on its counterclaim. Offsetting defendant's recovery against plaintiff's recovery, judgment is entered for plaintiff in the net amount of $27,840.77.

## OPINION OF COMMISSIONER

WILLI, Commissioner:

In 1939, plaintiff, a family-owned corporation, built a plant in Painesville, Ohio, for the processing of beryllium. At the onset of World War II, plaintiff was primarily engaged in the production of beryllium oxide for sale to the fluor-

escent lamp industry. Since beryllium was regarded as a strategic material in short supply, the Government was anxious that plaintiff increase its productive capacity. Thus, in late 1942, plaintiff was commissioned by the War Production Board to draw up plans for the expansion of its plant. It did this and in due course the Government, by the Defense Plant Corporation, a subsidiary of the Reconstruction Finance Corporation (RFC), spent almost $290,000 on a 7,600 square foot addition to plaintiff's plant plus the equipment required to produce beryllium metal, beryllium oxide, and beryllium alloys. The facility and equipment representing this investment were designated "Plancor 1716," and on March 16, 1943, plaintiff entered into a lease under which it was to operate and maintain the Government's facility for the sole purpose of producing beryllium products for the Government and for designated suppliers of the Government. The lease was to run until July 1, 1948, unless earlier terminated by appropriate notice, and rent was fixed at a stated percentage of plaintiff's sales of all beryllium products, whether produced in its own facility or in Plancor 1716.

At about the same time as the arrangements for Plancor 1716 were conceived and implemented, the Government also became interested in undertaking a project for the reclamation of beryllium scrap metal. It shortly determined to build a second plant on plaintiff's property for this particular purpose. Again, it commissioned plaintiff to draw up plans and equipment specifications. This second Government facility on plaintiff's property, unlike the first, was not physically connected to plaintiff's original plant. It was built as a separate building (though served by a common source of utilities), containing approximately 21,000 square feet, and representing a total investment by the Government of more than $210,000. This facility was designated "Plancor 1911," and on October 4, 1943, plaintiff entered into a lease with the Defense Plant Corporation to operate the plant for the sole purpose of producing beryllium copper ingots from beryllium scrap metal. Absent earlier termination on notice, the lease ran until September 30, 1948, and as annual rent, plaintiff was to pay a specified percentage of the Government's investment in the facility. Shortly after this plant commenced operations, its function was rendered obsolete by technological improvements in the fabrication of beryllium end products that reduced the beryllium content of waste scrap to the point where reclamation was no longer economically feasible.

The claims and counterclaims now presented for decision all arise out of the status of the two Plancors between the end of World War II and May 1956, when they were finally sold to a commercial chemical concern.

This court has heretofore disposed of one of the claims on which suit was brought. The court held barred by limitations plaintiff's claim that the Government had breached its lease agreements on the two Plancors, both of which contained rent-liquidation purchase option clauses, when the Atomic Energy Commission (AEC) built and operated its own beryllium plant at Luckey, Ohio, in 1949, and therefore stopped buying beryllium products from plaintiff. Clifton Products, Inc. v. United States, 169 F. Supp. 511, 144 Ct.Cl. 806 (1959).

Plaintiff's two subsisting claims are, first, that the Government breached a 1949 letter agreement to sell it the Plancors for $136,000 and, second, that the Government owes it reimbursement for the expenses that it incurred in maintaining the Plancors from 1948 until they finally were sold to another party in May 1956, after over six years of fruitless purchase negotiations with plaintiff.

In addition to resisting plaintiff's two claims, defendant filed a counterclaim for unpaid rent on the Plancors.

In support of their respective positions, the parties compiled a voluminous evidentiary record. Though the central facts are relatively few, and generally de-

cisive of the issues presented, they are submerged in a total factual theme that forms a long and sometimes meandering trail that is fully charted in the findings of fact accompanying this opinion. Repetition here will be limited to those factual essentials deemed dispositive of the several liability questions.

### The Breach of Contract Claim

The alleged breach of the 1949 letter agreement of sale was introduced into the lawsuit by an amended petition filed after the court decided against the plaintiff on its claim based on the AEC beryllium plant.

After the amended pleadings were in, defendant filed a motion for partial summary judgment on the breach count added by amendment. Plaintiff cross-moved on the same count and after briefs were filed, and by order and without oral argument, the court denied the parties' motions and remanded the case for trial.

In ruling as it did in its order, the court rejected defendant's contentions that the breach claim was barred by the general six-year limitation provision of 28 U.S.C. § 2501 and by the doctrine of laches. In urging the same propositions again, defendant has added nothing of significance to its earlier presentation.

Plaintiff's breach claim is without merit because, as a matter of fact, no Government breach of the 1949 agreement ever occurred. The evidence compellingly demonstrates that plaintiff was never ready and willing to implement the agreement.

As will be later detailed in discussion of defendant's counterclaim for back rent, in 1945 plaintiff entered into revised leases on the Plancors, oriented to civilian production. In 1949 plaintiff was tenanting all of Plancor 1716 and a small portion of Plancor 1911 when, on November 7, the General Services Administration (GSA), who by that time had succeeded to jurisdiction over the plants on the Government's behalf, sent plaintiff a letter detailing the terms and conditions under which it would sell both plants for a base price of $136,000. The letter is set forth in full in finding 11. On December 9, 1949, plaintiff's president formally signified acceptance of the terms of the letter.

Paragraph 5 of the GSA agreement letter provided:

All monies due the Government from Clifton Products, Inc., as of the effective date of the sale must be paid prior to closing of the transaction. This includes all rentals now in arrears.

Compliance with this requirement of total liquidation of rent arrearages proved to be the ultimate barrier to consummation of a sale to plaintiff.

Even before the matter of back rent loomed as the overriding obstacle to plaintiff's purchase of the plants, it equivocated as to fulfillment of its acceptance of the GSA proposal.

In March 1950, plaintiff wrote GSA requesting that "* * * action on the purchase of Plancors 1716 and 1911 be delayed by Clifton Products, Inc. to June 30, 1950 * * * in view of the present lack of definition of our contractural [sic] relationship with the U. S. Atomic Energy Commission." (Finding 14.) Plaintiff's president explained in his testimony that at the time of this request for deferral plaintiff was attempting to secure some AEC contract work to be performed in the Plancors. Without that work, he candidly acknowledged, plaintiff had no use for the plants. On May 4, 1950, GSA replied to plaintiff's letter and requested confirmation that the closing would occur not later than the June 30 date specified by plaintiff. On May 9, 1950, plaintiff replied, stating in part: "At the moment, we believe, that by June 30, there will be sufficient definition of contracts to permit us to complete our negotiations with you. Meanwhile, we would be pleased to have the opportunity to examine a draft of the final purchase plan contract which will be based upon our *tentative* agreement." [Emphasis added.] On

June 15, 1950, GSA, in reply, sent plaintiff a draft of a proposed deed and mortgage and again requested that the closing occur by July 1 or shortly thereafter. By August 25, 1950, plaintiff still had not replied to this letter or otherwise communicated with GSA with respect to a closing. Though plaintiff adduced no evidence justifying its failure to follow through with its purchase arrangements, as scheduled, the record strongly suggests that it was during this period that the matter of outstanding rent delinquencies assumed prominence in plaintiff's purchase aspirations. On or about July 12, 1950, plaintiff's president advised GSA that plaintiff was unable to pay a rent arrearage of approximately $2,600 on the two Plancors and requested GSA's intercession with AEC to assist it in collecting an account receivable allegedly owed by AEC. (Finding 59.) Moreover, plaintiff never made any more rent payments on either of the Plancors after July 1950. (Findings 56, 82.)

The evidence is uncontradicted that from the time that the 1949 letter agreement of sale was executed until approximately August 25, 1950, GSA was not only willing to close the sale in accordance with the terms of that agreement but frequently pressed plaintiff to fix a closing date. (Finding 22.) That agreement, it is undisputed, called for conveyance of the properties to plaintiff free of any restrictions as to their future use or disposition.

On or about August 25, 1950, after the Korean outbreak, the Munitions Board of the Department of Defense called on GSA to furnish it with an inventory of all Government-owned facilities so that a determination could be made as to need of them for defense purposes. GSA included Plancors 1716 and 1911 on the list that it sent the Munitions Board. They were listed among properties that had not been conveyed but were subject to outstanding sales commitments. Because of the Munitions Board action, GSA also notified its Chicago field office to take no further action to dispose of Plancors 1716 and 1911. Prior to receipt of this directive, GSA, Chicago, wrote plaintiff to advise that it had never received a reply to its June 15 letter forwarding the draft form of deed and mortgage. Upon receipt of that letter, plaintiff requested a meeting with GSA representatives in Chicago. The meeting was held in early September, and in the course of discussion relating to the 1949 letter agreement plaintiff was advised that in view of recent developments with the Munitions Board the terms of sale would have to include the so-called National Security Clause which had been promulgated April 1, 1950. 15 Fed.Reg. (Part 2) 1870. In essence, this provision requires that the purchaser of a designated Government plant agree that upon 120 days' notice he will reconvert to the production of specified defense items for which the plant was originally designed. A part from the obligation to effect such reconversion upon notice, the Clause imposes no restrictions on the use that the buyer can make of the plant in the meantime. 32 C.F.R. § 113.103-1 (Revised 1950). At the meeting plaintiff refused to agree to GSA's proposal that the National Security Clause be included in the terms of sale. Met with this refusal, GSA's representatives called on plaintiff to take a firm position as to whether or not the 1949 letter agreement remained a binding contract. Plaintiff declined to do this at the meeting but agreed that it would do so by letter promptly thereafter. (Finding 27.) Pursuant to this understanding, on September 14, 1950, plaintiff wrote GSA a letter that stated in part: "In accordance with our conversation of September 12, we agree that the purchase plan of the above captioned plancors should be indefinitely deferred pending better definition of the utilization of facilities and buildings and release by the Army Navy Munitions Board." (Finding 28.) GSA regarded this statement as too equivocal concerning the viability of the 1949 agreement and requested a more specific

statement from plaintiff as to whether it currently regarded the agreement as a binding commitment. (Finding 29.)

■ By a letter dated September 22, 1950, plaintiff said in reply: "It is our opinion that we reached an agreement with the Cincinnati Regional Office accepting a negotiated total price and the terms for the purchase of these plancors. However, we had only received a draft of the proposed purchase contract for consideration prior to the time of the discontinuation of the Cincinnati Regional Office. Thus all negotiations and the signing of the purchase contract were incomplete, and under such circumstances *we do not feel obligated to continue with the purchase plan.* We hope, however, that this plan can be held in abeyance pending further developments from all quarters, and that the negotiations can be renewed using as a basis the 'meeting of minds' reached with the Cincinnati Regional Office." [Emphasis added.] (Finding 30.)

This clear and considered statement of repudiation by plaintiff effectively and permanently relieved defendant of further obligation under the 1949 letter agreement. 4 Corbin, Contracts, § 975, at 916 (1951).

Notwithstanding the above-described events of September 1950, plaintiff continued occupying the leased portions of the Plancors without payment of rent and, until early 1956, remained in virtually constant negotiation with GSA directed to a purchase of the plants. The highlights of these negotiations are detailed in findings 31 through 47. Although plaintiff's contention is that its purchase efforts were frustrated, at least until 1952, by GSA's improper insistence on inclusion of the National Security Clause, it is unmistakably clear from the evidence that the real stumbling block was the matter of unpaid rent—a liability that necessarily increased in size as time went on. Thus, each of the unsuccessful purchase offers made by plaintiff provided, in effect, for forgiveness of rent arrearage as a part of the consideration to be given by the Government in return for a lump-sum purchase price with extended financing. (Findings 36, 39, 42 and 43.)

■ Finally, in late 1955 after almost five years of unproductive sales negotiations with plaintiff, GSA notified it to vacate the Plancors for nonpayment of rent. Promptly thereafter plaintiff's president entered into negotiations with the Lubrizol Corporation, a petroleum additive firm that had been plaintiff's principal customer since 1950. As a result of these negotiations, plaintiff gave Lubrizol an option to buy its own properties for $100,000 and then undertook to assist Lubrizol in persuading GSA to sell it the two Plancors on a private, negotiated basis. (Findings 48, 49.) GSA would not do this because at the time it lacked statutory authority to sell the properties by that method. Instead, GSA publicly advertised the Plancors for sale by sealed bid. At the opening, on May 15, 1956, Lubrizol was high bidder at $105,501, and the plants were sold to it. Lubrizol then exercised its option to buy plaintiff's properties. (Findings 49, 50.) Plaintiff voiced no objection to GSA's sale of the Plancors to Lubrizol and, in fact, undertook to assist the latter in buying them.

The evidence is clear that defendant breached no contract, express or implied, with plaintiff in dealing with the Plancors as it did.

### The Counterclaim for Unpaid Rent

■ Defendant has counterclaimed for allegedly unpaid rent on the two Plancors in the amount of $83,686.58, the bulk of which relates to Plancor 1716, the facility that the Government built onto plaintiff's own plant to form an integrated unit for the manufacture of beryllium products.

As heretofore noted, plaintiff stopped paying the Government rent in mid-1950 though it continued to tenant the Plancors until May 1956. Accordingly, aside from plaintiff's fallacious contention that it became a purchaser in possession

by virtue of the 1949 letter agreement with GSA and therefore as a matter of law was not obliged to pay rent, it is undisputed, even by plaintiff's former president, that unpaid rent is due the defendant. The real question goes to the amount of the arrearage and that issue turns on the construction of the relevant lease language.

Since defendant's counterclaim was asserted prior to July 18, 1966 (28 U.S. C. §§ 2415, 2416 as enacted by P.L. 89–505, 89th Cong., 2d Sess., 80 Stat. 304), it is not subject to the bar of limitations or the defense of laches. United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940).

I

*Plancor 1716*

Plaintiff's wartime lease on Plancor 1716 required it to use the premises only for the production of beryllium products for the account of the Government or its designated suppliers. Since the assets comprising this Plancor were functionally and physically integrated with plaintiff's own plant to form a single production unit, rent on the Government's property was fixed by reference to a stated percentage of total sales of products produced by the facility at large. No distinction was made among products, based upon the extent to which the production process actually involved either the Government's or the plaintiff's portion of the total facility.

During the war years, with the combined operation functioning in the manner envisioned when the Government made its investment, and with the Government taking the total output of the facility, the landlord-tenant relationship in the so-called scrambled facility went smoothly. At least the manner in which rent was determined created no serious problems.

When the war ended, the Government's demand for beryllium products materially diminished. Because of the consequent effect on its operations,

plaintiff initiated discussions with representatives of the RFC looking toward a revised lease arrangement under which the Plancor could be utilized for civilian production such as the manufacture of beryllium oxide for the fluorescent lamp industry, plaintiff's principal activity before the war.

On October 25, 1945, following preliminary discussions, plaintiff wrote RFC to request "an interim agreement" under which for the use of the facility it would pay a rental of 5 percent of its net sales and would be free to use the plant for civilian production. (Finding 53.)

By a telegram of November 5, 1945, RFC approved the substance of plaintiff's proposal. (Finding 54.) Regarding rent, the telegram stated: "As rental for the use of such facilities your company shall pay to RFC five percent of net sales of *all products manufactured or furnished by your company through the use of said facilities* * * *." [Emphasis added.]

A relatively minor portion of the counterclaim (approximately $2,500) fails as a matter of proof. (Finding 68.) Unlike the original lease on Plancor 1716, the 1945 revision imposed no rent on sales of products manufactured entirely in plaintiff's facilities. To the extent that the counterclaim asserts rent liability on such sales, it must be overruled.

Most of the additional rent obligation with which plaintiff is charged on Plancor 1716 arises after 1950 and depends on the meaning accorded the language of the Government's telegram, defining sales taxable for rent purposes as those involving products derived from "the use of said [Plancor 1716] facilities."

The quoted words, according to defendant, mean that cognizable sales included all items whose manufacture involved any use at all of any part of the Government's property even though such use be consistently minimal.

Until 1950, the precise meaning of the pertinent language did not become an is-

sue because plaintiff was using the Plancor for its intended purpose, the processing of beryllium. When the 1945 revision became operative, plaintiff resumed its principal prewar activity, the manufacture of beryllium oxide for sale to the fluorescent lamp industry. As it had been before the war, this again became the backbone of plaintiff's business. The Plancor was functionally well-suited to such an operation. The landlord-tenant relationship went reasonably well until human safety considerations prompted the AEC to ban the processing of beryllium on plaintiff's premises, both in plaintiff's facilities and in Plancor 1716. (Findings 64, 65.) This permanent embargo forced plaintiff to look to other endeavors with which to occupy its plant and personnel. In early 1950, it began doing contract custom work for the Lubrizol Corporation, the petroleum additive manufacturer that ultimately bought both the Plancor's and plaintiff's plant in 1956. (Finding 66.) Although the custom work involved some research and development projects, in the main it entailed conversion processes performed on raw material supplied by Lubrizol. Moreover, the work was done entirely with plaintiff's own equipment or equipment furnished by Lubrizol. In some instances, the equipment was operated in the floor area of Plancor 1716, and this was the extent that the Government's property was involved in the production process, none of its equipment being used for that purpose. (Findings 66, 68.) The Lubrizol work was plaintiff's principal activity after 1950 and steadily increased in volume. After 1953, when plaintiff finished the last of its research and development contracts for AEC, Lubrizol was its only customer.

■ Defendant's counterclaim proceeds on the theory that plaintiff's total revenues from Lubrizol are subject to the full 5 per cent rental charge under the 1945 agreement because, to the extent that production of the items involved entailed the use of floor space in Plancor 1716, the payments received were for "products manufactured or furnished * * * through the use of [the Plancor's] facilities" within the meaning of the lease language. (Finding 67.) For the reasons that follow, that is not a reasonable construction of the rental provision. Though plaintiff was not entitled to regularly use any part of the Government's property rent-free, it is not chargeable with rent on permanently idle equipment rendered useless for its intended purpose by the Government's own directive in the form of the AEC mandate. 6 Corbin, Contracts, § 1356, at 475–477 (1962). This is especially so where, as here, the lion's share of the rent charge sought to be collected was based on that equipment.

At the trial, defendant adduced extensive testimony from a former RFC executive whose supervisory position primarily concerned rental of Government facilities both for wartime operation and in the reconversion era. Moreover, on behalf of RFC, this individual personally approved the lease arrangement here involved. RFC's policies and practices in this connection are detailed in finding 55.

Basically, RFC's overriding objective in arriving at a rental charge was to achieve a specified annual rate of return on the Government's investment in each of the various types of capital assets that comprised the manufacturing facilities that it provided for leased operation by private industry. The target rates were (1) 5 percent per year on cost of land and buildings, (2) 12 percent per year on cost of general machinery and equipment, and (3) 25 percent per year on cost of special tooling. Where a facility was built as a separate production unit and not as an addition to an existing privately owned plant, rent was based directly on Government investment and charged as a fixed fee.

In the case of so-called "scrambled" facilities such as Plancor 1716, where the Government spent money to augment and increase existing production of particular items rather than to create a new and autonomous production unit,

RFC concluded that rent liability should be cast in terms of a fixed toll per unit of product produced by the merged facilities. Though for reasons of administrative convenience RFC preferred this format for rent-billing purposes, the policy objective was to achieve essentially the same rent return as charged directly in the case of separate Government-owned plants.

Where rent was charged in the form of a fixed percentage of total product sales, the percentage used was determined by first calculating the total annual rental charge that would be required to yield the various rates of return on investment that the Government assigned to the several types of assets comprising its total outlay. Next, a projection or forecast of the scrambled facility's annual production and sales was made. The percentage used in the lease agreement simply represented the proportionate part of each anticipated sale that in a year's time would aggregate the desired return on facility investment.

Accordingly, the evidence shows that whether the rent provisions of a lease indenture were drawn in terms of a fixed annual charge or as a stated percentage of product sales, the substance and intended purport were the same, i.e., a charge payable to the Government by a private operator for the use of an assemblage of capital equipment adapted to the production of one or more salable products. In short, a percentage-of-sales rental agreement was no less a lease of an associated complex of individual assets than was an agreement calling for rental a fixed fee.

The fact that the RFC's fixed, albeit unpublished, policy for scrambled facility reconversion leases called for the payment of rent on all sales products whose manufacture involved any part of the Government's property is not in conflict with the proposition that such leases were drawn in contemplation of a general use of the leased property. The policy simply meant that a lessee would not be heard to claim rent exemption or mitigation with respect to a particular sale or group of sales on the ground that manufacture of the products involved did not partake extensively of the Government's property. This says no more than that a rental arrangement subject to daily or weekly variation would be so erratic as to be impractical. Clearly, however, the policy envisions the situation where minimal facility usage is the relative exception, not, as here, the almost invariable rule that persisted for five and one-half years after 1950, during which period the evidence shows that plaintiff's activity was basically limited to use of the floor space in the Plancor.

The Government's total investment in Plancor 1716 was $289,143.41. Of this amount, $53,000 (approximately 18%) represented building, and the remainder was for equipment acquired and used to process beryllium. (Finding 65.) With a rental charge based on an annual percentage levy on each of the several components of the entire investment, the lease must be construed to comprehend at least a reasonable use of the facility generally. The effect of defendant's view is to assess plaintiff with rent on idle equipment as a surcharge or penalty for using floor space in the building.

Apart from the plain implications of the manner in which the rent charge was formulated, the intent of the lease language employed is evident from the prevailing circumstances at the time the 1945 revision was negotiated. Plaintiff's prewar business had been the processing of beryllium for the fluorescent lamp industry. With the slackening of Government demand for such products, plaintiff planned to revert to its former clientele, and this is what it successfully did. Of course, it requested freedom to make other civilian products as well, but the fact is that reentry into the beryllium oxide market for the civilian trade proved to be the backbone of its business until terminated by the 1949 AEC ban. The facilities of Plancor 1716 were adapted to and useful for this purpose. Thus, when the 1945 bargain was struck, the surrounding circumstances

were such that it can only reasonably be concluded that the parties were negotiating a lease for a production facility, not for a building shell that fortuitously had many assorted pieces of equipment in it. The rental charge should reflect that understanding.

■ The foregoing considerations combine to show that a reasonable interpretation of the lease language, if not the only permissible one, is that the full 5 percent rental charge presupposed a generally regular and reasonably complete utilization of the whole of the Government's property. Under familiar principles, that interpretation is to be preferred where the language under review was chosen by the Government and merely assented to by plaintiff by its use of the facility. 3 Corbin, Contracts, § 559, at 262 (1960). Application of that principle is particularly appropriate in the absence of corroborative evidence from defendant in support of its contrary view.

There remains the matter of specifically determining plaintiff's unpaid rent obligation on Plancor 1716 according to the 1945 rent provision as construed herein.

■■ After mid-1951, plaintiff realized small amounts of revenue from operations other than its contract work for Lubrizol performed altogether with non-Government equipment. Since such revenues, albeit small, were generated by the use of something more in Plancor 1716 than mere floor space, they should be taxed with the full 5 percent rental charge. In addition, in respect to the Lubrizol work, the Government is entitled to receive the 5 percent rate of return on investment that it ascribed to the asset that plaintiff used, *i. e.*, the $53,000 building. Thus, plaintiff's rental charge for the period following July 31, 1951, is the sum of (1) 5 percent on all sales revenues received from other than Lubrizol, plus (2) $2,650 per year on account of the Lubrizol contract work that utilized the Government's floor space. (Finding 68.)

In summary, as to Plancor 1716, defendant claims a gross rental due of $98,905.67. It is undisputed that plaintiff paid rent of $45,847.34 on the Plancor, leaving a remaining balance due of $53,058.33. As revised in accordance with the determinations herein, the gross rent obligation amounts to $55,-169.77. Defendant's rent claim on Plancor 1716 is therefore sustained to the extent of $9,322.43.

## II

### *Plancor 1911 and the Detroit Electric Furnace*

■ As earlier noted, Plancor 1911 was built on plaintiff's property with Government funds as a separate facility designed especially for the reclamation of beryllium-bearing scrap metal. Because technological advances in the fabrication of items made from such metal drastically reduced scrap wastage, reclamation became economically unfeasible shortly after completion of the facility. Since it embodied a single-purpose function and design, the Plancor became an idle plant and remained such until May 1945, when RFC's Defense Plant Corporation acceded to plaintiff's request to rent 3,500 square feet of floor space in the building plus the use of a Detroit Electric Furnace located in the building. (Findings 73, 74.) Rent as to both items was specified as a percentage of the Government's investment in them.

Whereas the revised rental provision for Plancor 1716 was adopted as an amendment to plaintiff's original lease (finding 54), the new agreement as to Plancor 1911 displaced the original lease, which was formally and totally terminated effective November 8, 1945. (Finding 75.)

Except for the period from May 1951 through 1952, when by agreement it occupied an additional 2,500 square feet of the Plancor, plaintiff used the 3,500 square feet of leased floor space from the time of its 1945 rental agreement until May 15, 1956, when the Plancor was sold. The rental rate applicable to

that space is not disputed. It results in a total rent obligation of $11,996.95, the amount of defendant's claim.

Though rent on the furnace, like the floor space, was expressed in terms of a percentage on the Government's investment, plaintiff's 1945 lease agreement was unclear as to whether rent liability was conditioned on actual usage. Subsequent exchanges between the parties concerning the lease disclosed a common understanding that the rent charge was payable only on usage. (Findings 78, 79, 101.) It appears that RFC's assent to this construction was largely influenced by the fact that plaintiff was only using a few of the component parts of the furnace and those only infrequently. On the basis of the agreed rate of return on the Government's total furnace investment, charged only for the period of actual usage of the component parts, the evidence shows that plaintiff is chargeable with total furnace rent of $1,638.19.

In summary, plaintiff's gross rent obligation on Plancor 1911 totals $13,635.-14, $11,996.95 for floor space and $1,-638.19 for the furnace. Against these liabilities, plaintiff paid a total of $6,-230.90, its last payment having been made in July 1950. Therefore, defendant's counterclaim for rent relative to Plancor 1911 is sustained in the amount of $7,404.24, the remaining balance of rent due. (Finding 85.)

Accordingly, defendant's total counterclaim for rent due on both of the Plancors is upheld in the amount of $16,726.-67, consisting of $9,322.43 for Plancor 1716 and $7,404.24 for Plancor 1911.

*The Claim for Custodial Expenses and Insurance Coverage*

■ Plaintiff claims a right to reimbursement of the expenses that it incurred for protection and maintenance of the Plancors and the premiums paid for the property damage insurance that it carried on them. Any recovery due on the merits must, of course, be limited to such expenses as were incurred with-

in six years preceding assertion of the claim in this court. 28 U.S.C. § 2501.

In disputing this claim defendant does not deny that plaintiff furnished the custodial services and insurance coverage for which reimbursement is sought. Liability is denied on other grounds.

■ Plaintiff's claim for expense reimbursement with respect to Plancor 1716 is without merit as to both protection and maintenance and insurance coverage. For the six-year period in question, plaintiff occupied the Plancor under the terms of the November 1945 revision to its original lease. Essentially, the revision amounted to a new rent provision plus an adoption of all of the other terms of the original lease. (Finding 54.) Under the original lease, plaintiff expressly assumed the obligation and expense of providing protection and maintenance as well as insurance coverage for the Plancor. Since the 1945 revised lease remained in force throughout plaintiff's subsequent occupancy of the premises, it cannot be relieved of the expense burden of the items in question.

The situation as to Plancor 1911 differs in certain material respects. The differences alter the result on recovery of protection and maintenance expenditures but not insurance premium expense.

The original lease on Plancor 1911 contained the same provisions as that on 1716 concerning plaintiff's protection, maintenance, and insurance responsibilities. Effective November 8, 1945, however, the 1911 lease was fully and formally terminated. The termination, as such, unqualifiedly ended plaintiff's custodial and insurance obligations. In addition, the document by which RFC acknowledged and implemented the termination affirmatively advised plaintiff that it need no longer insure the premises, except as it desired to do so for its own reasons. (Findings 75, 76.)

■ Both the May 26, 1945 lease agreement, covering 3,500 square feet of Plancor 1911 floor space plus the Detroit Electric Furnace, and the November 19,

1946 reaffirmation of the same agreement (necessitated by the intervening termination of the original lease) specifically defined plaintiff's custodial and insurance obligations and expressly limited those obligations to the leased property. (Findings 74, 79.) The latter agreement remained unchanged and in force as the governing lease indenture throughout the balance of plaintiff's tenancy of the Plancor. Apart from the written lease agreements, at no time after November 8, 1945, the termination date of the original lease, was plaintiff ever directed or requested by anyone connected with the Government to insure the unleased portion of Plancor 1911. Accordingly, it must be held that in providing such coverage plaintiff acted as a volunteer who may not now insist on payment for a benefit that was not only unauthorized by the recipient but specifically disclaimed in advance.

The expense reimbursement claim for protection and maintenance services on Plancor 1911 is controlled in part by the same documents applicable to insurance coverage.

Again, the starting point is the original 1943 lease that expressly placed the protection and maintenance expense burden for the entire Plancor on plaintiff. That the formal and complete termination of that lease in November 1945 was generally understood as ending plaintiff's custodial responsibilities on the Plancor is demonstrated by the fact that in April 1946 RFC commissioned plaintiff, for a $2,500 fee, to place Plancor 1911 in a standby or moth-balled condition. (Finding 90.) Further, at approximately the same time RFC entered into a written agreement with plaintiff to provide protection and maintenance services for the unleased portion of the Plancor on a monthly fee basis. From April 1946 through October 30, 1948, RFC paid plaintiff $7,269.09 under this agreement. (Finding 91.)

As earlier noted, during the period that RFC was paying plaintiff to protect and maintain the bulk of the Plancor, plaintiff was leasing a small fraction of the total floor space and one piece of equipment, the electric furnace. The lease agreements of May 1945 and November 1946 expressly confined plaintiff's custodial responsibilities to the property that it was leasing. In terms, the latter agreement gave either party the absolute right of termination upon 10 days' notice to the other.

The foregoing summarizes the background and prevailing status of the plant protection and maintenance situation as it existed in the fall of 1948.

On November 1, 1948, Government jurisdiction over the Plancors shifted from RFC to the War Assets Administration (WAA), an agency established for the specific purpose of disposing of the many plant facilities that the Government had established for war production. (Finding 96.) This particular action was a part of the overall program for liquidation of Government-owned defense plants on a nationwide scale. There is neither evidence nor argument that WAA's succession to RFC's landlord status for these Plancors had, or was intended to have, any effect on the terms and conditions of plaintiff's continued occupancy of the premises under the lease in force at the time. As to Plancor 1911, the relevant lease in effect was the November 19, 1946, letter agreement. (Finding 79.)

On October 28, 1948, because of the impending transfer of the Plancors to WAA, RFC notified plaintiff that the protection and maintenance fee agreement was terminated as of October 31, 1948.

On September 10, 1948, preparatory to its nominal takeover of the Plancors, WAA presented plaintiff with separate inventory schedules of the various items of property comprising each of them. As to each plant, the lists were footed by a certification over the place for signature on behalf of the plaintiff. For Plancor 1911 the certification warranted that the accompanying inventory lists "* * * accurately reflect property for which the undersigned is ac-

countable under the Lease Agreement and Amendments thereto with Reconstruction Finance Corporation, dated October 4, 1943 as assigned to the War Assets Administration." (Finding 93.) Plaintiff's president signed the Plancor 1911 lists as presented, including this certification.

Though not squarely urged by defendant, it will be seen that the language quoted above is at the heart of the asserted defense to plaintiff's expense reimbursement claim. Thus, the defense is not presented on the basis of the purport and effect of the quoted language but on the claim that by its subsequent conduct, plaintiff evidently accepted the interpretation that WAA placed on that language. Since the express terms of the certification do not purport to create any new accountability or responsibility in plaintiff for plant property but only to declare existing obligations under a specific lease that was nonexistent at the time, the obliqueness of defendant's approach is understandable though not convincing.

There is absolutely nothing in the record to suggest that the inventory certification was either offered to or endorsed by plaintiff as an alteration of the lease under which it occupied Plancor 1911 at the time. As defendant would have it, merely by signing the inventory papers, plaintiff was agreeing, contrary to its lease and contrary to the custodial arrangement under which it had been operating with RFC, to assume the responsibility and expense of protecting and maintaining the entire building and all of the equipment in Plancor 1911 even though it was renting only 3,500 square feet of the 21,000 square feet of the building's total floor space and only one piece of its equipment. Nowhere does defendant offer the slightest suggestion as to the consideration that flowed to plaintiff in return for its alleged assumption of such a new and substantial burden. In fact, the record discloses none. For example, there was never any indication that WAA's willingness to continue the No-

vember 19, 1946 lease agreement, with its 10-day termination provision, was conditioned upon plaintiff's reciprocal agreement to care for the Government's unleased property.

The related events following the September 10, 1948 inventory certification are summarized below.

On November 2, 1948, plaintiff wrote WAA, acknowledging its awareness of the shift of Plancor jurisdiction to that agency and requesting billing instructions for its monthly charges for providing protection and maintenance. (Finding 96.)

The stance adopted by WAA in responding to plaintiff's inquiry, and thereafter adhered to by the agency, is dispositive of plaintiff's entitlement under this claim.

The substance of WAA's reply letter of November 5, 1948, amounted to an affirmative directive to plaintiff to protect and maintain the entire Plancor. (Finding 97.) From plaintiff's standpoint, the directive became no less compelling when WAA coupled it with the assertion that plaintiff would have to provide the services at its own expense because it assumed this obligation when it certified to the accuracy of the inventory data on September 10. For liability purposes, the significant point is that WAA made it clear that it wanted all of the Plancor protected and maintained.

Certainly WAA was within its rights in declining to either revive the custodial fee arrangement under which plaintiff had operated with RFC or to initiate some new plan of compensation for the services. But the agency was not content to simply notify plaintiff that it would not pay for custodial services rendered in the future, leaving plaintiff, thus forewarned, free to provide or withhold such services according to its own dictates in the matter. Instead, WAA went on to tell plaintiff that it had to provide the services. This is what plaintiff proceeded to do, advising WAA by a letter of November 11, 1948, that it had not assumed new and addi-

tional custodial responsibilities simply by acknowledging the inventory accounting. (Finding 98.)

As earlier noted, defendant finesses the merits of the inventory certification question in favor of urging that plaintiff must be held to have accepted WAA's interpretation, as advanced in its November 5 letter, because on two occasions thereafter plaintiff did not except to a restatement of that same position in the inspection reports of two WAA engineers. (Findings 100, 101.) The specifics of the two later occurrences do not support defendant's implication.

■ The first inspection report, dated January 10, 1939, was prepared by a WAA engineer who had surveyed the 1911 premises on December 29, 1948, for fire safety. Included in his report were statements to the effect that plaintiff was obliged, by reason of the earlier inventory certification, to provide protection and maintenance. (Finding 100.) For all that appears, these expressions were simply a reflection of a personal opinion that the engineer reached on his own.

The second report, also dated January 10, 1949, was prepared by another WAA engineer who had made a general condition survey of the 1911 premises that day. Unlike the first report, this one was signed by plaintiff's president under the caption "REPORT CONCURRED IN BY LESSEE." (Finding 101.) In format the report was of the printed form type. After correctly specifying the pertinent terms of the existing operating lease (as contained in the letter agreement of November 19, 1946), the report proceeds to a caption styled "LEASE TERMS FOR P&M." In that connection the engineer noted plaintiff's reimbursement contract with RFC. Next, under caption "OBLIGATION OF TENANT" the engineer added "Lessee signed Exhibit C assuming accountability for real and personal property, on 9–

10–48." Finally, the engineer completed the caption "OBLIGATION OF WAA" with the notation "None specified." At most, these statements add up to the proposition that after WAA took over the Plancor, the risk of loss or damage to plant property was on plaintiff. They do not signify any contention, much less agreement, that plaintiff was to actively and currently protect and maintain the entire plant property.

Accordingly, the engineering reports, both individually and cumulatively, fall far short of establishing the kind of estoppel by implication on which defendant relies to defeat the claim for reimbursement.

■ The conclusion that persuasively emerges from all of the evidence on this question is that WAA definitely wanted the plaintiff to render the same custodial services to the Government's property that it had performed for RFC, but it did not want to pay for them. In short, WAA wanted the benefits but not the expense burden of plaintiff's arrangements with RFC. The expedient means of achieving this best-of-both-worlds result, WAA apparently concluded, was the inventory certification that plaintiff signed. For the reasons previously stated, that action cannot, on the merits, reasonably be accorded the significance that WAA attributed to it. With the certification argument appropriately put to rest, the remaining essentials are simply that plaintiff was called upon to render valuable services to the Government's property; it did so, and it follows that it is entitled to be reimbursed the expenses that it incurred in fulfillment of the Government's wishes. 3 Corbin, Contracts, § 566, at 306–308; § 567, at 323–324 (1960).

Preparatory to trial of this case, defendant audited plaintiff's books and records. The audit revealed that from July 31, 1951 (six years prior to the institution of suit) to May 15, 1956, when it vacated the Plancors, plaintiff had

spent a total of $208,531.99 for what the auditor deemed protection and maintenance. (Finding 103.) Neither plaintiff's records nor other evidence adduced at trial provide the basis for directly apportioning this total expenditure among plaintiff's own plant and the two Plancors. In such circumstances, and considering the character of the services involved, a reasonable method of apportionment is one based on the proportionate floor space square footage that each of the facilities bore to the total square footage of all three. In addition, such an allocation must allow for the square footage of Plancor 1911 that plaintiff had under lease and for which it was thereby responsible.

One further refinement is necessary in recognition of the fact that throughout the period in question Plancor 1911 was a predominantly idle facility, whereas Plancor 1716 and plaintiff's adjoining plant were in use. Included in the auditor's total expense figure were the items of $58,764.95 for heat, light, and power and $19,564.51 for repairs and replacements on auxiliary equipment. To a substantial degree, neither of these types of expenses is engendered by a substantially idle plant. Accordingly, they are eliminated from the expenses to be spread over the three facilities.

An allocation made in the manner described above discloses that plaintiff spent $44,567.44 to protect and maintain the unleased portion of Plancor 1911 from July 31, 1951 to May 15, 1956. Since it provided the services underlying this expense at the behest of the Government, it is due reimbursement. It is recognized that the allocation method applied herein produces larger monthly expense figures than those experienced when plaintiff was performing the services under its reimbursement contract with RFC. The difference is logically attributable to the significantly increased age of the plant during the period covered by the current claim.

The end result of the foregoing dispositions of the several claims in suit is that plaintiff is entitled to a net judgment for $27,840.77, consisting of $44,-567.44 for protection and maintenance expense reimbursement less $16,726.67 back rent due the Government on its counterclaim.